Robert G. Schaffer (ASBN #017475)
**ROBERT G. SCHAFFER, PLC**
13220 North Scottsdale Road, Suite 1055
Scottsdale, AZ 85254-0113
Email: rschaffer@rgslawfirm.com
Phone: (602) 448-5642

Jamie R. Kurtz (*pro hac vice* forthcoming)
JKurtz@robinskaplan.com
Paul D. Weller (*pro hac vice* forthcoming)
PWeller@robinskaplan.com
Munir R. Meghjee (*pro hac vice* forthcoming)
MMeghjee@robinskaplan.com
Marcus A. Guith (*pro hac vice* forthcoming)
MGuith@robinskaplan.com
Kyle D. Nelson (*pro hac vice* forthcoming)
KNelson@robinskaplan.com
Alexa R. Ely (*pro hac vice* forthcoming)
AEly@robinskaplan.com
**ROBINS KAPLAN LLP**
800 LaSalle Ave, Suite 2500
Minneapolis, MN 55402
T: (612) 349-8500
F: (612) 339-4181

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA
### PHOENIX DIVISION

| | |
|---|---|
| United Healthcare Services, Inc.; UnitedHealthcare Insurance Company; and UMR, Inc., | Case No.: |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| Radiology Partners, Inc.; and Sonoran Radiology, Ltd., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

# INTRODUCTION

1.      Defendant Radiology Partners, Inc. ("Radiology Partners") has weaponized a federal law intended to shield patients from surprise medical bills, transforming it into a vehicle to obtain a windfall for its private equity backers. The Federal No Surprises Act ("NSA") was designed to establish a fair and balanced process—called Independent Dispute Resolution ("IDR")—for determining out-of-network reimbursement rates for service performed by medical providers. Congress's goals were clear: protect patients, encourage equitable payments between providers and health plans, and rein in soaring healthcare costs. Crucially, only a defined set of out-of-network services are eligible for the IDR process.

2.      Radiology Partners, however, is abusing the NSA by knowingly and illegally submitting ineligible claims to the IDR process, securing excessive, windfall payments to which it has no legitimate right. This scheme has nothing to do with seeking fair payment for their providers but rather is about funneling millions into the pockets of its private-equity owners, all at the expense of Plaintiffs (collectively, "United"), the businesses United serves, and millions of employees whose health plans United administers.

3.      Congress enacted the NSA with a clear purpose: to establish an independent system to resolve out-of-network payment disputes between health care providers and health benefit plans in a manner that is "fair to both providers and plans that also does not increase aggregate healthcare system costs."[1] Indeed, in enacting the NSA, Congress noted that it was looking to combat "inflated out-

---

[1] Lawson Mansell and Sage Mehta, Niskan Center, *New data shows No Surprises Act arbitration is growing healthcare waste*, (June 18, 2025), Available at: https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/#:~:text=In%20December%202020%2C%20Congress%20passed,out-of-network%20care.

of-network prices" which have "made health care an attractive market for private equity firms, hedge funds, and venture capital firms." H.R. REP. 116-615, 53 (December 2, 2020).

4.    Despite Congress's intent, the NSA's IDR process is now being used as a tool for exploitation by certain unethical provider groups and their private equity investors. Those provider groups and billing companies have manipulated the process, securing massive payouts—sometimes exceeding 1,000% of Medicare rates—for claims that did not qualify, thereby extracting unjust sums from health benefit plans that far outstrip ordinary in-network rates.

5.    Radiology Partners stands at the center of this abuse, orchestrating a scheme to subvert the NSA for its own profit. Its scheme began by systematically acquiring radiology practices all over Arizona that were already contracted to be in-network with United. Rather than honor the rates agreed to in these network contracts, Radiology Partners engineered a strategy to inflate their reimbursements by creating a sham out-of-network entity, Defendant Sonoran Radiology Ltd. ("Sonoran"), which held no contract with United.

6.    By engaging in "pass-through billing," a classic form of healthcare fraud, Radiology Partners funneled legitimate in-network claims through Sonoran, making them appear out-of-network and thus eligible for higher payments. The groups that actually performed the services had already agreed to lower contracted rates, but by fraudulently billing the claims in this way, Radiology Partners sought (and received) inflated reimbursements.

7.    But Radiology Partners' misconduct did not stop there. Starting in 2022, Radiology Partners escalated its scheme and began initiating IDRs on these false "out-of-network" services to obtain even greater payments, far in excess of what is reasonable or affordable. Defendants initiated tens of thousands of IDRs, all based on the false pretense that these were qualifying out-of-network services performed by Sonoran, when in reality the services were subject to in-network

agreements. For each IDR proceeding, Defendants knowingly provided false certifications to United, the IDR entities, and the U.S. Department of Health & Human Services that "the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process."

8.    The scope of Defendants' scheme is staggering. Radiology Partners, together with a handful of other private equity-backed provider groups, is responsible for "a large and disproportionate share of IDR cases" nationwide.[2] In fact, Radiology Partners alone accounts for over 90% of all IDR cases involving claims for professional radiology services. And Sonoran, limited in scope to Arizona, ranks among the nation's top IDR-initiating parties. This systematic abuse of the NSA IDR process is not only egregious but unprecedented, threatening the very integrity of the protections Congress intended to create.

9.    Further, despite Congress' intention that in-network rates be a key factor in setting fair out-of-network rates, Radiology Partners-affiliated practices are regularly receiving awards of more than 600% of median in-network rates, for services that are not even eligible for the NSA's IDR. Worse yet, in what appears to be a deliberate strategy by Defendants and their private equity investors to abuse the NSA IDR process to increase their profits, Defendants began increasing Sonoran's billed charges (and corresponding NSA IDR offers) to reach nearly 1,600% of Medicare's rates.

10.    Beyond the unconscionable NSA awards Defendants received on ineligible claims, United and its employer customers have been forced to pay exorbitant amounts in administrative fees as a result of Defendant's illegal use of the NSA. Each time Defendants submit a service to the formal NSA IDR process,

---

[2] Matthew Fielder and Loren Adler, Brookings Institute, *A first look at outcomes under the No Surprises Act arbitration process*, (March 27, 2024), Available at: https://www.brookings.edu/articles/a-first-look-at-outcomes-under-the-no-surprises-act-arbitration-process/.

United is forced to pay administrative fees. Those fees are often higher than the price of the underlying medical services. United and its employer customers have paid over $24 million in administrative fees alone related to ineligible IDR disputes initiated by Defendants since January 1, 2022.

11. Defendants' fraudulent out-of-network billing and abuse of the NSA harms United's members, the employers whose plans United administers, and society at large. When Defendants bill claims out-of-network, rather than under the applicable contract, members are often forced to pay higher out-of-pocket costs. Likewise, employers pay higher total reimbursement rates for services when they are billed out-of-network. And those rates are compounded by the egregious NSA awards and administrative fees associated with the IDR dispute process. Finally, this abuse of the NSA harms society at large as it increases the cost of healthcare for everyone. Researchers have commented that absent corrective action, "patients will ultimately bear the cost through higher premiums and the administrative overhead of an increasingly exploited arbitration process."[3]

12. United brings this action to put an end to Radiology Partners' exploitation of the NSA and to recover tens of millions of dollars lost to this orchestrated and unlawful scheme.

## THE PARTIES

13. Plaintiff United HealthCare Services, Inc., is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota. United HealthCare Services, Inc., is a claim administrator for health plans, including those offered and funded by employers.

14. Plaintiff UnitedHealthcare Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of

---

[3] Lawson Mansell and Saga Mehta, *New data shows No Surprises Act arbitration is growing healthcare waste*, Niskanen Center, (June 18, 2025), Available at: https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste.

business in the State of Connecticut. UnitedHealthcare Insurance Company insures and administers health plans, including for employers.

15.     Plaintiff UMR, Inc., is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Wisconsin. UMR, Inc., is a third-party claims administrator for health plans, including plans offered and funded by employers.

16.     Defendant Radiology Partners, Inc., is a Delaware corporation. Upon information and belief, Radiology Partners' principal place of business is in El Segundo, California.

17.     Defendant Sonoran Radiology, Ltd., is an Arizona Corporation. According to filings made with the Arizona Corporation Commission, Sonoran's principal place of business is in Phoenix, Arizona.

## JURISDICTION AND VENUE

18.     The NSA authorizes judicial review of awards issued in IDR proceedings under the same circumstances enumerated in Section 10(a) of the Federal Arbitration Act. See 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II); 9 U.S.C. § 10.

19.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1331 because it arises under federal law. Specifically, United asserts a claim under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq, and The Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, et seq. This court also has subject-matter jurisdiction over this matter pursuant to the NSA and its implementing regulations, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, because this matter requires the Court to interpret and apply the NSA and its implementing regulations, and because 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) expressly authorizes judicial review under the circumstances present here. Finally, the Court further has subject-matter jurisdiction over United's state and common

law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy.

20.    This Court has general and specific jurisdiction over Sonoran because Sonoran was created and is domiciled in Arizona, its principal place of business is in Arizona, and it systematically and continuously conducts business in Arizona, including the acts that give rise to this lawsuit.

21.    This Court has specific jurisdiction over Radiology Partners because it directed, aided and abetted, conspired to commit, and did commit tortious acts within the state of Arizona. Specifically, Radiology Partners controls Sonoran and the other medical groups described below in the state of Arizona, used Sonoran to submit fraudulent claims to United for medical services rendered in Arizona, and took additional tortious acts and/or omissions in Arizona as further described below. Radiology Partners' scheme also caused injury to United and its plan sponsors in Arizona.

22.    Venue is proper in this District under 28 U.S.C. § 1391 because Sonoran resides in this district and a substantial part of the events giving rise to the claims in this action occurred in this District. Specifically, within this District, Radiology Partners created Sonoran; Radiology Partners and Sonoran conspired together to submit fraudulent claims; and Radiology Providers and Sonoran initiated improper NSA IDR proceedings.

**OUT-OF-NETWORK BILLING**

23.    United maintains a network of providers for its health plans. The providers who are "in network" have contracted with United to provide services to United's members at agreed upon rates.

24.    On the other hand, if a provider does not have a contract with United, there is no agreement between United and the provider as to the rate a United health plan will pay the provider for services rendered to a United member. Instead, the amount paid for an out-of-network claim is calculated according to

the terms of each patient's specific health plan. The out-of-network reimbursement varies from plan to plan, while some pay a percentage of the Medicare rate, others pay the average in-network rate for a given market, and yet others pay a percentage of the provider's billed charges. And unlike certain federal healthcare programs, which have standardized reimbursement rates for most healthcare services, until Congress passed the NSA and unless a state law applied, there was no mechanism to protect patients from the often-egregious rates that providers charge for their services. These providers are referred to as "out-of-network" providers.

25.     Historically, when a patient chose to see an out-of-network provider, a health plan would pay an out-of-network provider the amount required by the terms of the health plan. Then, some providers would "balance bill" patients for the difference between the rate they billed and the amount the health plan allowed. Because providers set their billed amounts unilaterally, their billed charges often had no relation to the actual cost of care, market rates, or any other measure of reasonable value for the services, and the balance bills to patients could be massive, posing a significant hardship for patients.

26.     Sometimes, a patient has no choice over who provides their care and thus cannot avoid receiving care from an out-of-network provider, such as with emergency care. In other situations, a patient may have be treated at an in-network hospital, but unbeknownst to the patient, some of the providers staffing the hospital and involved in their care (e.g., anesthesiologists or radiologists) may be out-of-network.[4]   In either scenario, unless a state law applied to prohibit a

---

[4] Note that hospital and physician billing generally occurs separately. The hospital will bill for so-called "facility fees" in connection with provision of hospital space, equipment, staff, nursing care, and other hospital services. The physician providers will bill for so-called "professional fees" for their physician services such as emergency medicine services or reading/interpreting radiology images. The hospital and the physicians may sometimes be all in-network with a particular health plan, or the hospital may be in-network while certain physicians that staff the hospital are not.

provider from balance billing, the patient may receive a "surprise" balance bill for out-of-network services the patient had no choice in or control over.

27.    To protect patients, Congress enacted the NSA in 2020 to end "surprise medical bills." Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–2890 (2020). The NSA is intended to protect patients from surprise out-of-network medical bills for three categories of care: (1) out-of-network emergency services, (2) out-of-network non-emergency services performed at in-network facilities, and (3) out-of-network air ambulance services. See 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135. Notably—and indisputably—the NSA does not apply to services performed by in-network providers.

**THE NSA'S INDEPENDENT DISPUTE RESOLUTION PROCESS**

28.    Beyond establishing certain patient protections, the NSA also created an IDR process for resolving payment disputes on claims between out-of-network providers and health plans. See 42 U.S.C. § 300gg-111(c). If an out-of-network provider wishes to dispute the reimbursement it received from a health plan for an eligible claim, it may initiate the IDR process. The provider and health plan then have a 30-day period to negotiate a rate. If no agreement is reached, then either party may elect to proceed to a formal IDR dispute.

29.    Importantly, the IDR process is only available to a "nonparticipating provider or a nonparticipating facility." Id. § 300gg-111(c)(1)(A).

30.    A "nonparticipating provider" is defined as a "health care provider who is acting within the scope of practice of that provider's license or certification under applicable State law and who does not have a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively." Id. § 300gg-111(a)(3)(E)(v)(G)(i). "Nonparticipating" is more commonly referred to as "out-of-network."

31.    In contrast, a "participating provider" is defined as a "health care provider who is acting within the scope of practice of that provider's license or

- 8 -

certification under applicable State law and who has a contractual relationship with the plan or issuer, respectively, for furnishing such item or service under the plan or coverage, respectively." Id. § 300gg-111(a)(3)(E)(v)(G)(ii). "Participating" is more commonly referred to as "in-network."

32.    A provider initiating an IDR must attest that they meet the required criteria.

33.    For instance, the process of initiating a formal IDR requires providers to use an online portal created by the U.S. Department of Health & Human Services (HHS). The portal's first page confirms a party initiating IDR must provide an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process":

> **Along with the general information you'll need to start your Federal IDR dispute process, provide:**
> - Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
> - Dates and location of qualified IDR items or services
> - Type of qualified IDR items or services such as emergency services and post-stabilization services
> - Codes for corresponding service and place-of-service
> - Attestation that qualified IDR items or services are within the scope of the Federal IDR process
> - Your preferred certified IDR entity

34.     Before initiating the IDR process, the provider must also sign and date an "ATTESTATION" that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process":

> **8. ATTESTATION:**
>
> ___ I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> **Initiating Party (or Representative of the Initiating Party):** _____
>
> **Print Name:** _____     **Date:** _____

35.     The IDR process is a "baseball-style" arbitration. The provider and insurer each submit a proposed reimbursement amount and explanation to the arbitrator. Id. § 300gg-111(c)(5)(B).

36.     The arbitrator, referred to as the "IDR entity," must then select one of the two proposed amounts, taking into account various criteria. Id. § 300gg-111(c)(5)(C)(ii).

37.     One of these criteria is the Qualifying Payment Amount ("QPA"), which is a calculation that represents the median in-network rate for a given service rendered by the same or similar provider in a given region.

38.     Congress expected that most items and services submitted to the IDR process would be paid at or around the QPA. Indeed, Congress' intent was to make the QPA a key metric in the NSA IDR process as opposed to a provider's "billed charges," which is an arbitrary amount chosen by a provider with no relation to the amount health plans or individuals usually pay for that service.[5]

39.     When the NSA was passed in 2021, the Internal Revenue Service, Employee Benefits Security Administration and Health and Human Services

---

[5] *Requirements Related to Surprise Billing: Part II,* 86 Fed. Reg. at 55,996 (Oct. 7, 2021) (median contracted rates typically represent reasonable market values because they "are established through arms-length negotiations between providers and facilities and plans and issuers (or their service providers).")

Department estimated that there would be approximately 17,435 disputes submitted to the IDR process each year.[6] That is not what has happened.

### THE NSA'S INDEPENDENT DISPUTE RESOLUTION PROCESS

40.     While it was originally estimated that use of the IDR would be limited, those estimates turned out to be very wrong. 390,346 disputes were submitted to the IDR process in the second half of 2023. In 2024, providers initiated 1.5 million disputes to the IDR process—a 300% year-over-year increase and more than 70 times the annual case load Congress anticipated.[7]

41.     More than 85% of the disputes were decided in favor of providers, often at exceptionally high (and above-market) rates.[8]

42.     The median awarded rate is now more than four times greater than the QPA.[9] In other words, Radiology Partners and others who are abusing the system are asking for, and the IDR entities are regularly awarding them, four times more than a typical in-network provider in the same area who has negotiated a market rate with the payor. This is flatly inconsistent with Congress's intent and expectation, and antithetical to efforts to make healthcare more affordable for Americans.

43.     The ever-increasing median awarded rate has emboldened these private-equity backed providers to submit increasingly high offers in the Federal IDR process, relative to the QPA. The following chart shows that increasing

---

[6] https://www.federalregister.gov/documents/2022/08/26/2022-18202/requirements-related-to-surprise-billing#footnote-68-p52637

[7] Lawson Mansell and Sage Mehta, Niskanen Center, *New data shows No Surprises Act arbitration is growing healthcare waste*, (June 18, 2025), Available at: https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/#:~:text=In%20December%202020%2C%20Congress%20passed,out-of-network%20care.

[8] *Id.*

[9] *Id.*

provider offers are further driving up IDR awards far above median in-network rates.[10]



Figure 2. High provider offers are driving up IDR awards far above median in-network rates

Source: Authors' analysis of Center for Medicare and Medicaid Services Independent Dispute Resolution Report
Note: Only includes emergency and nonemergency care, excludes air ambulance

44.    Even worse, providers are increasing their billed charges in the hopes of being awarded even higher, more unconscionable reimbursement rates, and are refusing to make meaningful settlement offers in the open negotiation process.[11] This strategy to increase billed charges to result in higher awards is especially prevalent amongst private equity backed providers.

---

[10] *Id.*
[11] *Id.*

45.    Researchers have commented that "absent corrective action from policymakers, patients will ultimately bear the cost through higher premiums and the administrative overhead of an increasingly exploited arbitration process."[12]

46.    A handful of large, often private equity-backed providers are driving the increase in both the number of IDR disputes being initiated and the increase in the rates being demanded.[13]

47.    Two-thirds of all cases submitted to the Federal IDR process were submitted by just five entities: Radiology Partners, Team Health, SCP Health, AGS Health, and HaloMD. Radiology Partners, TeamHealth, and SCP Health are all owned by private-equity companies and have a business model of market consolidation which has resulted in decreased competition and increased prices for medical services.

48.    Radiology Partners was the top initiator of NSA payment disputes across the entire country in 2024 with more than 244,000.[14] Indeed, Radiology Partners accounted for 15% of all NSA disputes in Q4 of 2024 and 18% of all such disputes in Q3 of 2024.

49.    On average, Radiology Partners-affiliated practices are receiving awards of more than 600% of the QPA. This has emboldened Radiology Partners to continue its scheme.

---

[12] *Id.*

[13] Jack Hoardley, Kennah Watts, and Zachary Baron, Health Affairs, *Independent Dispute Resolution Process 2024 Data: High Volume, More Provider Wins*, (June 11, 2025), Available at: https://www.healthaffairs.org/content/forefront/independent-dispute-resolution-process-2024-data-high-volume-more-provider-wins

[14] Marty Stempniak, Radiology Business, *Radiology Partners the No. 1 initiator of No Surprises Act disputes with 136,784*, CMS says, (May 30, 2025), Available at: https://radiologybusiness.com/topics/healthcare-management/healthcare-economics/radiology-partners-no-1-initiator-no-surprises-act-disputes-136784-cms-says.

## RADIOLOGY PARTNERS' BUSINESS MODEL

50.    Radiology Partners is a private-equity-backed conglomerate of radiology groups.

51.    Created in 2012, Radiology Partners now claims $3 billion in annual revenue,[15] employs more than 4,000 radiologists at 3,400 sites in all 50 states,[16] and handles more than 10% of the country's imaging volume.[17]

52.    Radiology Partners' rapid growth follows from its founders' core business plan: to consolidate the radiology market. As its private-equity backers exclaimed when raising an initial $700 million for Radiology Partners, it was "time to pour gasoline" on a "fragmented" radiology market.[18]

53.    Upon information and belief, the private equity firms backing Radiology Partners have exerted and continue to exert considerable control, influence, and direction over the operations of Radiology Partners and its "affiliated" radiology practices.

54.    For instance, New Enterprise Associates ("NEA")—the largest private equity investor in Radiology Partners—has invested hundreds of millions of dollars in the company. Radiology Partners' Chairman, Chief Executive Officer, and Co-Founder, Rich Whitney, is a partner in NEA. Mohamad Makhzoumi, the

---

[15] Marty Stempniak, Radiology Business, *Radiology Partners the No. 1 initiator of No Surprises Act disputes with 136,784*, CMS says, (May 30, 2025), Available at: https://radiologybusiness.com/topics/healthcare-management/healthcare-economics/radiology-partners-no-1-initiator-no-surprises-act-disputes-136784-cms-says.

[16] *Our Practices*, Radiology Partners, https://www.radpartners.com/about-us/our-practices/.

[17] Emily Hayes, *What's the Endgame for Private Equity in Radiology?*, AuntMinnie.com (Dec. 14, 2021), https://www.auntminnie.com/industry-news/article/15630042/whats-the-endgame-for-private-equity-in-radiology.

[18] Heather Mack, *NEA-Founded Radiology Startup Hits $4 Billion Valuation*, Wall Street Journal, (July 18, 2019), https://www.wsj.com/articles/nea-founded-radiology-startup-hits-4-billion-valuation-11563492304.

co-Chief Executive Officer of NEA, has also been on Radiology Partners' Board of Directors throughout the period relevant to this dispute.

55.    Star Investment Holdings ("SIH") has also invested hundreds of millions into Radiology Partners. Geoff Clark, a former Senior Managing Director at SIH, was on Radiology Partners' Board of Directors during the relevant period.

56.    Radiology Partners says the "commonality among [its] handful of outside investors is that they are growth oriented . . . ."[19]

## RADIOLOGY PARTNERS' PASS-THROUGH BILLING SCHEME

### Step One: Radiology Partners Covertly Acquires Medical Groups.

57.    Radiology Partners carries out its operations through local radiology groups that it covertly acquires and then controls. Radiology Partners has achieved a sizeable market share in Arizona through acquisitions.

58.    Radiology Partners acquired its first Arizona group, Southwest Diagnostic Imaging d/b/a SMIL Southwest Medical Imaging ("SMIL"), for $390.9 million on December 4, 2017.

59.    Prior to its acquisition by Radiology Partners, SMIL was "fully owned and operated" by "36 board-certified and fellowship-trained radiologists." After the acquisition, however, the ownership and management positions were all replaced by Radiology Partners employees, including Rich Whitney (Radiology Partners' co-founder and CEO), Caren Weakley (Radiology Partners' former General Counsel), Jamie Larsen (Radiology Partners' Chief Financial Officer), and Anthony Gabriel (Radiology Partners' co-founder and former Chief Operating Officer).

---

[19] Dr. Gavin Slethaug, *Let's Talk About Private Equity and Other Outside Investors in Radiology*, Radiology Partners (Feb. 14, 2024), https://www.radpartners.com/2024/02/lets-talk-about-private-equity-and-other-outside-investors-in-radiology/.

60.     Sun City Imaging Ltd. ("Sun City") is another example of an Arizona-based radiology practice that was acquired by Radiology Partners. Prior to its acquisition by Radiology Partners, Sun City was owned and operated by the radiologists who practiced as part of the Sun City medical group, including Drs. A. Steven Charney and F. Zifa Wang. After Radiology Partners acquired it in May 2018, Radiology Partners installed its own employees as the executives and officers, including Rich Whitney (Radiology Partners' co-founder and CEO), Anthony Gabriel (Radiology Partners' co-founder and former Chief Operating Officer), and Steve Tumbarello (Radiology Partners' former Chief Financial Officer).

61.     In addition to SMIL and Sun City, Radiology Partners has also acquired other radiology groups in Arizona, including but not limited to Associated Valley Radiologists, Arizona Professional Radiology Services, PLLC, and EVAC LLC. With each acquisition, Radiology Partners installed its own employees as the executives and officers of these medical groups.

62.     Rather than notify health plans of the groups' change in ownership as required by the groups' contracts with United, Radiology Partners presents itself as simply a "billing" or "management" company for the medical groups it acquires, as if the groups were independent from Radiology Partners. This is done so Radiology Partners can conceal its ownership and its control over these groups.

63.     In reality, though, Radiology Partners has complete control over the operations of the medical groups (including billings and collections), provides full financial and management support, and takes all residual benefits and bears all residual losses from the medical groups' operations.

64.     At the time Radiology Partners acquired them and began to exert management control, SMIL, Sun City, Associated Valley Radiologists, Arizona Professional Radiology Services, and EVAC were each in network and had an active contract with United that included agreed upon reimbursement rates.

**Step Two: Radiology Partners Creates Sonoran as a Shell Company.**

65.    Not satisfied with the contract rates that SMIL and the other Radiology Partners-affiliated medical groups in Arizona had negotiated with United, Radiology Partners devised a scheme to bill those medical groups' claims out-of-network so that it could receive significantly higher reimbursement rates than had been negotiated with United all while the in-network agreements with United for each of the physician groups Radiology Partners now managed remained in place.

66.    On November 8, 2019, Rich Whitney—Radiology Partners' co-Founder and CEO—incorporated an entity called Red Rock Imaging Associates, Ltd. ("Red Rock") with the Arizona Corporation Commission. Whitney appointed himself the sole director of Red Rock.

67.    Shortly thereafter, on February 25, 2020, Red Rock formally changed its legal name to Sonoran Radiology, Ltd. ("Sonoran"). Whitney appointed himself the CEO and President of Sonoran; Gabriel was appointed the COO and Secretary; and Tumbarello was appointed the CFO and Treasurer.

68.    Approximately one month later, on March 13, 2020, Sonoran received its National Provider Identifier ("NPI") from the U.S. Centers for Medicare & Medicaid Services.

69.    Sonoran also obtained its own Tax Identification Number ("TIN"), a unique number used by the Internal Revenue Services to identify individuals and entities for tax purposes. Health plan administrators, like United, use the TIN to identify providers, much like a social security number for individuals, and rely on the TIN in paying claims. A TIN is used by providers to bill claims for services they render and when a provider bills under a TIN, it is representing that the entity associated with that TIN performed the services being billed.

70.    Once it had set up Sonoran, Radiology Partners rebranded the other Arizona groups it had acquired and now managed as "divisions" of Sonoran.

These purported "divisions," however, were simply Radiology Partners' other Arizona-based medical groups, which remained intact as the standalone medical practices that they were prior to their affiliation with Radiology Partners. The groups were not acquired by Sonoran and did not operate as divisions of Sonoran. Instead, labeling these other medical groups as "divisions" of Sonoran was nothing more than a facade that Radiology Partners is using to try to legitimize its pass-through billing scheme. Even today, these medical groups continue to be separate and standalone legal entities actively registered in Arizona, and several of them still have active and enforceable network contracts in place with United.

**Step Three: Radiology Partners Uses Sonoran to Bill for Services Rendered by _Other_ Radiology Groups**

71.    Once Radiology Partners had set it up, Sonoran began billing United for services rendered by the other medical groups owned and controlled by Radiology Partners.

72.    Those other medical groups previously billed United for their services directly according to their in-network agreements when applicable. But, after Radiology Partners got Sonoran up and running, Radiology Partners directed all services to be billed by Sonoran rather than by the medical group that actually performed the services.

73.    By submitting claims to United under its own name and TIN, Sonoran was falsely representing to United that it had rendered the services being billed.

74.    The medical groups, and their respective physicians, continued to provide the same care, to the same patients, in the same locations all while maintaining in-network agreements with United. The only difference was that Defendants billed the groups' services through Sonoran, instead of billing United directly as required under the groups' contracts with United. Defendants orchestrated this pass-through billing scheme in order to obtain higher reimbursements.

75.    The following shows how this worked in practice using SMIL as an example. For decades, SMIL had an in-network contract with United and it billed its services to United directly. After Radiology Partners acquired SMIL and created Sonoran, SMIL's claims stopped being billed by SMIL—and, instead, all of SMIL's services were billed through Sonoran:



76.    The above chart shows this change in billing behavior. Until the beginning of 2021, claims for services rendered by physicians associated with SMIL were billed by SMIL pursuant to its in-network agreement. However, once Radiology Partners implemented its scheme, all of SMIL's claims were billed by Sonoran as out of network. Each physician has their own individual NPI. The chart above shows how all of the NPIs (individual physicians) whose claims were originally billed by SMIL, were switched to being billed by Sonoran in or around January of 2021.

77.    When billed properly, SMIL's claims were processed and paid according to the rates United bargained for, as set forth in SMIL's network contract with United. When SMIL's claims were billed by Sonoran, however, the claims were processed as out-of-network and reimbursed at higher rates.

78.    In total, Defendants used Sonoran to improperly bill United for services performed by 714 physicians affiliated with groups that had existing in-network agreements with United.

### RADIOLOGY PARTNERS' FRAUD HARMS MEMBERS

79.    In addition to causing United and its plan sponsors to overpay on claims billed by Sonoran, Defendants' fraud scheme also directly harms members enrolled in plans insured and administered by United throughout the state of Arizona.

80.    By fraudulently billing claims out-of-network, resulting in higher payments, the Defendants also fraudulently inflated the amounts that members pay out-of-pocket.

81.    Plans insured and administered by United (and all other payors) encourage members to seek care from "in-network" providers by having lower out-of-pocket costs associated with care obtained by such providers. Those out-of-pocket costs increase when claims are billed as out-of-network.

82.    In the case of Defendants' scheme, members have sought care from in-network providers just to have the services unknowingly billed out-of-network under Sonoran's TIN.

83.    This has resulted in members paying more than they should in co-pays, deductibles, or co-insurance.

### DEFENDANTS' PRE-NSA PASS-THROUGH BILLING

84.    The following two specific examples of Dr. Gavin Slethaug and Dr. Michelle Lai are illustrative of Radiology Partners' pre-NSA out-of-network pass-through billing scheme.

85.    Dr. Gavin Slethaug joined SMIL in approximately 1999 as an "associate" radiologist.

86.    As already referenced, SMIL is a radiology group in Arizona that has its own TIN and, from at least 2011 through July of 2024, had its own in-network

contract with United. It is not surprising then that claims for services rendered by Dr. Slethaug were billed as in-network claims to United by SMIL from 2011 through 2020.

87.    Beginning in approximately January of 2021, Radiology Partners inexplicably began billing the services rendered by Dr. Slethaug as out-of-network claims under Sonoran's TIN.

88.    The financial impact to United, its customers, and members of this switch was huge.

89.    For example, on August 10, 2020, Dr. Slethaug read a CT scan of a United member's head (CPT 70450). This service was billed to United as an in-network claim using SMIL's TIN, and resulted in payment of $███ pursuant to SMIL's contract with United.[20] The service was billed to an employer-funded plan administered by Untied.

90.    But on May 21, 2021 (after Defendants caused SMIL's services to be billed as out-of-network claims by Sonoran), Dr. Slethaug read the same type of CT scan at the same facility as described above. This time, however, Dr. Slethaug's service was fraudulently billed as an out-of-network claim using Sonoran's TIN, and resulted in a payment of $███

91.    Thus, by switching to Sonoran's TIN, Radiology Partners wrongfully caused United's employer customer to pay more than double for the same service Dr. Slethaug had performed at the same facility just nine months earlier.

---

[20] The Medicare rate for this service is $42.60.

92.    Despite Sonoran's misrepresentations to United that Dr. Slethaug was performing services as a Sonoran physician, Dr. Slethaug remains on SMIL's website as a SMIL doctor:



93.    He also still publicly identifies as an "[e]xperienced interventional radiologist with SMIL (Southwest Medical Imaging)":



94.    Dr. Slethaug also writes for MedCityNews and, as recently as February of 2024, described himself in the byline as "an interventional radiologist at Southwest Medical Imaging (SMIL)":



**Dr. Gavin Slethaug**

Dr. Gavin Slethaug serves as associate chief medical officer of growth and executive vice president of practice partnerships for Radiology Partners, leading and supporting all initiatives of the practice's growth team, including partnerships and M&A, internal market development and national health system relationships. Dr. Slethaug is an interventional radiologist at Southwest Medical Imaging (SMIL) and HonorHealth, in Scottsdale, Arizona. He is a partner at SMIL and has held numerous leadership positions within SMIL, HonorHealth and Southwest Diagnostic Imaging. Currently, he serves on the board of AZPACT (Arizona Physicians Advancing Cardiovascular Treatment) and also on the leadership council for HonorHealth's Heart and Vascular Institute. Dr. Slethaug earned his medical degree from University of Toronto. He completed both his residency and fellowship in interventional radiology at Mallinckrodt Institute of Radiology at Washington University Medical Center in St. Louis, Missouri.

95.     And, in fact, in an interview published by Radiology Partners on February 14, 2024, Dr. Slethaug also introduced himself as a "Shareholder at Southwest Medical Imaging"—with no mention whatsoever of having any affiliation with Sonoran:



96.    Despite the foregoing, since approximately January of 2021, claims for services rendered by Dr. Slethaug have been billed almost exclusively using Sonoran's TIN.

97.    Indeed, all said, Defendants have wrongfully caused at least 1,042 claims for services rendered by Dr. Slethaug to be billed by Sonoran, totaling more than $550,416.26 in charges.

98.    Sonoran was not entitled to reimbursements for these claims, and United would not have paid Sonoran but for its misrepresentations when billing services rendered by Dr. Slethaug.

99.    As another example, Dr. Michelle Lai joined SMIL as a neuroradiologist in approximately 2011. Again, not surprisingly, services rendered by Dr. Lai were billed as in-network claims under SMIL's TIN and in-network contract with United from 2011 through 2020.

100.    However, beginning in approximately January of 2021, services rendered by Dr. Lai were billed as out-of-network claims under Sonoran's TIN. This caused United to pay dramatically higher rates for the same services.

101.    For example, on November 2, 2020, Dr. Lai interpreted an MRI of a United member's spine (CPT 72148). This service was billed to United as an in-network claim using SMIL's TIN, and resulted in payment of $▆▆▆ pursuant to SMIL's contract with United.[21] This claim was billed to an employer-funded plan administered by United.

102.    However, on April 23, 2021, Dr. Lai interpreted the same type of MRI at the same facility as described above. This time, however, it was billed as an out-of-network claim using Sonoran's TIN, which resulted in a payment of $▆▆▆.

103.    By switching to Sonoran's TIN, Defendants wrongfully caused United's employer customer to pay 900% more for the same service at the same location.

104.    Moreover, the member cost-share amounts across these examples nearly doubled when Sonoran billed the claim out-of-network, rather than through the network agreement that applied to that service.

105.    Even now, though, Dr. Lai still appears on SMIL's website:



106.    Dr. Lai also still publicly identifies as a "Neuroradiologist at [SMIL]":

---

[21] The Medicare rate for this service is $74.98.



107.    Dr. Lai's license with the Arizona Medical Board—which was just renewed in July of 2024—also lists her as being a SMIL radiologist:



108.    Despite the foregoing, since approximately January of 2021, claims for services rendered by Dr. Lai have been billed to United under Sonoran's TIN.

109.    Indeed, all said, Defendants have wrongfully caused at least 419 claims for services rendered by Dr. Lai to be billed under Sonoran's TIN, totaling more than $340,252 in charges to United.

110.    Sonoran was not entitled to reimbursements for these claims, and United would not have paid Sonoran but for its misrepresentations.

111.    While the examples of Drs. Sleuthag and Lai are representative of Radiology Partners' larger pass-through billing scheme, United has no reason to believe that Drs. Sleuthag and Lai – or any of the other physicians whose services were billed by Sonoran – were aware of, or were complicit in, the improper and illegal billing of claims for services they rendered.

**DEFENDANTS SYSTEMATICALLY EXPLOIT THE NSA IDR PROCESS**

112.    As described above, the medical groups that Radiology Partners acquired in Arizona—including SMIL—had in-network contracts with United during the relevant time.

113.    Accordingly, claims for services rendered by physicians of those medical groups at those medical groups' locations should have been billed by those groups, using those groups' TINs, under the terms of their contracts with United.

114.    Instead, Radiology Partners caused those claims to be fraudulently billed as out-of-network by Sonoran.

115.    Beginning in 2022, Radiology Partners and Sonoran improperly availed themselves of the NSA IDR process by using it to dispute reimbursement amounts paid to Sonoran on claims related to services performed by other Radiology Partners groups that had in-network agreements with United, and therefore whose services were ineligible for the NSA IDR process. By doing so, they extracted large awards which greatly exceeded the reimbursement rates that the various medical groups had negotiated with United, forced United's customers and members as well as United itself to incur needless fees and expenses, and further drove up the cost of radiology services across the market for patients and employers and the cost of health care to society at large.

116.    Each time it initiated the IDR process under the NSA, Sonoran falsely "attested" to the U.S. Department of Health & Human Services, the IDR entities, and United "that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process." Below is a representative example of this false attestation:



**Conflict of Interest Attestation**

✓ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

Signature:                                              Date:
Sonoran Radiology, LTD                                  11/17/2024

117.    This attestation was not accurate because "the item(s) and/or service(s) at issue" were not, in fact, "qualified item(s) and/or service(s) within the scope of the Federal IDR process." Indeed, the services at issue were ineligible because they were rendered by participating (i.e., in-network) providers. Many services that Sonoran disputed through the IDR process were ineligible for additional reasons, including: (1) failure to timely initiate open negotiations; (2) failure to timely initiate the IDR process after open negotiations; (3) ineligibility of the services submitted to the IDR process (for example services performed at out-of-network facilities); (4) disputes initiated for services rendered to non-United members; and (5) disputes initiated for plans that are not subject to the NSA.

118.    Worse yet, emboldened by the unconscionable awards it was receiving on ineligible claims, Sonoran began to increase its billed charges and offers in order to obtain even higher awards even further divorced from the market competitive rates anticipated by Congress in passing the NSA.

119.    For example, as the chart below demonstrates, SMIL's billed charges were approximately 400% of Medicare prior to the scheme at issue. When Sonoran started improperly billing claims for this same group of providers, Sonoran's billed charges exceeded 1,100% of Medicare. This led to a substantial windfall for Defendants:



120.    As Defendants started to obtain more NSA awards in their favor, Sonoran started further increasing their billed charges in November of 2023 to be eventually nearly 1,600% of Medicare:



121.    This has led to a dramatic increase in the cost of radiology services for all.

*Defendants Improperly Initiate IDR on In-Network Services.*

122.    In total, Sonoran improperly has disputed more than 78,000 claims adjudicated by United through the NSA's IDR progress, submitting a false attestation every time, and Sonoran continues to do so.

123.    The following examples of services rendered by Dr. Howard Harvin, Dr. Bernadette Diegnan, and Dr. Jason Barclay-White are illustrative of Defendants' pattern of doubling down on its fraudulent pass-through billing scheme by illegally initiating IDRs for services that were fraudulently billed and ineligible for IDR because they involved in-network services.

124.    Dr. Harvin joined SMIL in approximately 2004.

125.    To this day, Dr. Harvin still appears on SMIL's website:



126.    He also still publicly identifies as a radiologist for SMIL:



127.    Dr. Harvin also teaches continuing education webinars through eMedEvents, wherein he describes himself as "a radiologist at [SMIL]":



128.    Accordingly, claims for services rendered by Dr. Harvin were billed by SMIL, according to its contract with United, for years.

129.    But after Radiology Partners acquired SMIL and then created Sonoran, it began improperly billing claims for services performed by Dr. Harvin through Sonoran instead of SMIL. Beginning in 2022, Defendants expanded its nefarious billing practices – further damaging United and its plan sponsors – by initiating IDRs to dispute the reimbursement amount received by Sonoran on certain claims for services rendered by Dr. Harvin.

130.    For instance, Sonoran billed United for an interpretation of a cardiac MRI (CPT Code 75557) performed by Dr. Harvin on May 1, 2024. Given SMIL's in-network agreement with United, this claim was contractually obligated to be reimbursed at a rate of $███. Instead, because this claim was fraudulently billed as out of network under Sonoran's TIN, it sent United a bill for its full billed charges of $███. Given the patient's plan benefits for out-of-network claims, this resulted in a reimbursement amount that was 40% greater than if it had been properly billed by SMIL, according to its in-network agreement with United. This claim was billed before the member had met his deductible. As a result, the member was responsible for paying the full allowed amount on the claim. Because the claim was billed out-of-network rather than under the SMIL contract, the member had to pay nearly $█ more out-of-pocket than if the claim had been appropriately billed.

131.    Apparently not content with the extra 40% that they had already fraudulently obtained, Defendants initiated an NSA IDR on this claim to obtain an even higher reimbursement.

132.    Sonoran was then awarded $1,032.20 on this claim—which is more than 977% of the Medicare rate and many times greater than the rate agreed upon by SMIL and United.

133.    On top of this amount, United was also forced to incur and pay arbitration administrative fees totaling $1,030.00—all on a claim that never should have been billed by Sonoran in the first place and that was ineligible for NSA IDR.

134.    Dr. Diegnan joined SMIL in approximately 2019.

135.    To this day, Dr. Diegnan still appears on SMIL's website:



136.    She also still publicly identifies as a "partner" at SMIL:



137.    Before Sonoran, claims for services rendered by Dr. Diegnan were billed by SMIL.

138.    But after Radiology Partners created Sonoran, Radiology Partners began billing Dr. Diegnan's claims through Sonoran. Following the enactment of the NSA, Defendants further damaged United and its plan sponsors by initiating IDRs to dispute reimbursement amounts Sonoran received on claims for services rendered by Dr. Diegnan.

139.    For instance, Sonoran billed United for an interpretation of a brain MRI (CPT Code 70553) performed by Dr. Diegnan on April 4, 2023. Because this claim was billed under Sonoran's TIN, it resulted in reimbursement 30% greater than if it had been properly billed by SMIL, according to its in-network agreement with United. This claim was billed before the member had met his deductible. As a result, the member was responsible for paying the full allowed amount on the claim. Because the claim was billed out-of-network rather than under the SMIL

contract, the member had to pay $█ more out-of-pocket than if the claim had been appropriately billed.

140.    Defendants then disputed United's out-of-network reimbursement and initiated an NSA IDR.

141.    Sonoran was thereafter awarded $860.60 on this claim—which is more than 790% of the Medicare rate and several multiples greater than SMIL's contract rate.

142.    On top of the award, United was also forced to incur and pay administrative fees totaling $1,100—more than even the awarded reimbursement rate—for a claim that never should have been billed by Sonoran and that was ineligible for NSA IDR.

143.    Dr. Jason Barclay-White joined Sun City Imaging sometime prior to 2018.

144.    Sun City Imaging is a radiology group in Arizona that has its own TIN and, its own in-network contract with United dating back to 2005. Accordingly, claims for services rendered by Dr. Barclay-White were billed as in-network claims to United without issue.

145.    However, in 2018, Radiology Partners acquired Sun City Imaging. Shortly thereafter, in approximately June of 2021, Radiology Partners began billing the services rendered by Dr. Barclay-White as out-of-network claims under Sonoran's TIN.

146.    The financial impact to United, its customers, and members of this switch is huge.

147.    For example, on March 16, 2024, Dr. Barclay-White read a CT scan of a United member's lumbar spine (CPT 72131). Had this service been properly billed to United as an in-network claim, it would have resulted in a reimbursement of $█ per the contractually agreed upon rate. The service was billed to an employer-funded plan administered by United.

1    148.    But Defendants billed this claim instead as out-of-network under

2    Sonoran's TIN, which resulted in a payment of ▮▮▮▮—an increase of over 30%.

3    149.    Not satisfied with this, Defendants then initiated an NSA IDR over

4    this service. Defendants were only able to do so by misrepresenting that Dr.

5    Barclay-White was affiliated with Sonoran and was out-of-network with United,

6    neither of which was true.

7    150.    Through their false representation, Defendants then procured an

8    award for this service in the amount of $421.81— which is more than 970% of the

9    Medicare rate and several times greater than the contract rate for the same service.

10    151.    On top of the award, United's employer customer was also forced to

11    pay another $165.80 in administrative fees and expenses.

12    152.    Despite Defendants submitting Dr. Barclay-White's claims under

13    Sonoran's TIN, and then making representations in the NSA IDR process that Dr.

14    Barclay-White was affiliated with Sonoran and out-of-network with United, Dr.

15    Barclay-White still holds himself out to the public as being affiliated with Sun City

16    Imaging.

17    153.    For example, Dr. Barclay-White's license with the Arizona State

18    Medical Board—which was renewed in 2025—lists Sun City Imaging as his

19    practice:

20
21
22
23    

**Arizona Medical Board**

Processing...

24
25    **General Information**

26    **Jason M. Barclay-White MD**          License Number: 30450
      Sun City Imaging                       License Status: Active
      10401 W Thunderbird Blvd               Licensed Date: 06/19/2002
27    Sun City AZ 85351                       License Renewed: 02/26/2025
      Phone:                                 Due to Renew By: 03/31/2027
28                                           If not Renewed, License Expires: 07/31/2027

154.    Dr. Barclay-White's LinkedIn also still represents that he is a "Radiologist" with "Sun City Imaging":



155.    Dr. Barclay-White also still appears on Sun City Imaging's website:

*Defendants' Pattern of Initiating IDR Disputes on Ineligible Services Goes Beyond Pass-Through Billing*

156.   As discussed above, the NSA IDR process has strict eligibility requirements in addition to the requirement that the services be rendered by out-of-network providers.

157.   In addition to the scheme described above, Defendants regularly initiated NSA IDRs—and then obtained awards—for services that were ineligible for the NSA IDR process. For example, Sonoran submitted claims for formal IDR that were ineligible because the type of service was ineligible, the service was not covered, there was no open negotiation filed for the service, the IDR dispute was not timely initiated, the service  was subject to a prior IDR dispute, and the services were improperly batched together in a single IDR dispute.

158.   As one example, the first step of the NSA IDR process is an open negotiation. A provider must initiate open negotiation via written notice within 30 days of the health plan's first notice of payment or denial for the service. See 42

U.S.C. § 300gg-111(c)(1)(A). The provider must thereafter exhaust a 30-day open negotiation period. See 42 U.S.C. § 300gg-111(c)(1)(B). Then – and only then – the provider may proceed to formal IDR if it was unable to negotiate an agreement with the payor. Id.

159.   Defendants received IDR awards on over 4,000 disputes for which they never initiated an open negotiations period.

160.   A provider must also initiate the formal NSA IDR process within four business days after exhaustion of the open negotiations period. 42 U.S.C. § 300gg-111(c)(1)(B).

161.   Defendants regularly failed to meet this eligibility requirement but still procured awards against United.

162.   For example, Sonoran billed United for services provided to a United member on July 26, 2023, and later, on November 28, 2023, initiated an open negotiation under the NSA for these services. The open negotiation was unsuccessful. Therefore, the deadline to initiate IDR was January 4, 2024.

163.   Despite this, Defendants did not initiate a formal NSA IDR process for these services (DISP-973697) until December 9, 2024—more than eleven months after the deadline had lapsed. This was for a claim billed to an employer-sponsored plan administered by United.

164.   Nevertheless, Defendants were able to still procure an NSA IDR award for these services that was $7,886.37 greater than the amount that United had originally paid for the service at issue.

165.   On top of this award, United's employer customer was also forced to incur administrative fees of $1,305.00.

**Defendants Procure Payments that Exceed Billed Charges on Ineligible Claims**

166.   As discussed above, the reason for Defendants' abuse of the NSA is clear—they are getting a massive windfall by submitting claims through the NSA.

167.    Congress' intent was to make the median in-network rate—known as the qualifying payment amount ("QPA")—a key metric in the NSA IDR process as opposed to a provider's "billed charges," an arbitrary amount chosen by a provider to charge for a given service or item. See Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. at 55,996 (Oct. 7, 2021) (median contracted rates typically represent reasonable market values because they "are established through arms-length negotiations between providers and facilities and plans and issuers (or their service providers).").

168.    Indeed, Congress specifically noted in enacting the NSA that it was looking to combat "inflated out-of-network prices" which have "made health care an attractive market for private equity firms, hedge funds, and venture capital firms." H.R. REP. 116-615, 53 (December 2, 2020).

169.    Despite this intent, certain providers, such as Defendants, have obtained NSA IDR results that often skew significantly higher than the QPA and, at times, higher than their own billed charges for the services being disputed.

170.    In order to induce the IDR entities to issue awards higher than the providers' billed charges, Defendants consistently and deliberately inflate their offers above their already inflated billed charges. This appears to be a deliberate strategy by Defendants and their private equity investors to abuse the NSA IDR process to increase their profits. There is no legitimate basis for a provider to demand payments higher than what they charge for a given service.

171.    For instance, on June 10, 2024, Defendants initiated an open negotiations period for services related to a read of an abdominal ultrasound. Sonoran's own billed charges for these services were $██. This claim was billed to an employer-funded plan administered by United.

172.    However, through the NSA IDR process (DISP-1566769), Defendants were able to procure an award that resulted in the employer paying ██ for these services—$██ more (or 33% higher) than Sonoran's own billed charges.

173.    United's employer customer was also forced to pay administrative fees of $605 on top of this inflated award.

174.    This claim is just one example of the NSA gone drastically wrong. United's employer customer was forced to pay Sonoran more than its own billed charges for a service that was not even eligible for the NSA because it was not actually performed by an out-of-network provider.

***Defendants Misrepresent that Sonoran had a Network Agreement with United.***

175.    Each side's offer submission in the NSA IDR process is confidential to the other party. However, based on awards rendered in favor of Sonoran, it appears Defendants are making another material misrepresentation in their offers—namely, that Sonoran previously had contracted for rates with United.

176.    These misrepresentations have allowed Defendants to obtain awards higher than Sonoran's own billed charges.

177.    For instance, Sonoran submitted a claim to United for a read of a head CT scan rendered on June 9, 2023. Sonoran's billed charges for this service were $██.

178.    On April 25, 2024,[22] Sonoran initiated the formal IDR process for this service (DISP-979561).

179.    United submitted an offer to pay the service at issue at 100% of the QPA—i.e., the median, in-network rate paid for these services.

180.    Sonoran submitted an offer of $██—an amount nearly 70% higher than their billed charge amount and 1602.17% higher than the QPA.

---

[22] An open negation was initiated for this service on August 16, 2023. Thus, this formal IDR initiation was untimely and ineligible for this reason as well.

181.   The IDR entity rendered an award in favor of Sonoran on the basis of evidence that Sonoran submitted based "the contracted rate between the parties during the previous four years":

> It is Provider Resources, Inc.'s determination that the initiating party's offer of $█████ best represents the value of the qualified IDR service at issue in this dispute. Hence, Provider Resources, Inc. has determined Sonoran Radiology, LTD, the initiating party, prevailed.
>
> The QPA for the service at issue in this dispute (70450) is █████.
>
> Sonoran Radiology, LTD submitted an offer of $█████ (1602.17% of QPA).
>
> UNITED HEALTHCARE, Inc., the non-initiating party, submitted an offer of $█████ (100% of QPA).
>
> Provider Resources, Inc. finds the most compelling evidence in this case to be the contracted rate between the parties during the previous four years.
>
> Sonoran Radiology, LTD presented evidence that under their prior contract with UNITED HEALTHCARE, Inc., in effect as recently as 2021, their agreed upon rate for the service at issue in this dispute was $█████, significantly higher than the QPA.

182.   But Sonoran has *never* had a network agreement with United or any agreement with United as to rates. Moreover, none of Radiology Partners' other Arizona groups had network agreements with United that reimbursed at the rate at which Defendants apparently represented in their IDR submission.

* * *

183.   The examples above are merely representative of the tens of thousands of claims that Radiology Partners and Sonoran improperly billed out-of-network using Sonoran's TIN and then improperly placed at issue in NSA IDR.

184.   These IDR awards have forced United and its employer customers to pay Sonoran on claims for which it was not entitled to payment. United and its customers have also been forced to incur millions of dollars of administrative fees on claims that were not eligible for NSA IDR.

185.   The result of this scheme has been an increase in costs for radiology services all across the state of Arizona.

**RADIOLOGY PARTNERS' EFFORTS TO CONCEAL ITS FRAUD**

186.    Radiology Partners has gone to extreme lengths to conceal its fraud from United and the general public.

187.    Radiology Partners gave its employees and agents strict guidelines about how to interact with health plans, including United, in order to ensure that they did not tip the plans off about the pass-through billing scheme.

188.    For instance, Radiology Partners' employees were instructed not to communicate with certain departments at United and to submit requests to United in a manner specifically designed to avoid raising any red flags.

189.    Because these instructions and restrictions were obviously intended to deceive payors, numerous Radiology Partners employees filed and/or lodged complaints. Often those employees were disciplined or terminated by Radiology Partners.

190.    As payors like United caught onto the scheme, Radiology Partners tried to retroactively cover its tracks.

191.    For instance, the groups improperly billing under Sonoran's TIN have recently changed their websites to claim they are a "division of Sonoran Radiology, Ltd." and "provide radiology services to patients throughout the United States, including Sonoran Radiology":



Copyright 2024 RP Valley Radiologists, a **Radiology Partners** Practice | All Rights Reserved | References to the Practice RP Valley, Radiology Partners, RadPartners and RP include its managed and owned medical practices that provide radiology services to patients throughout the United States, including Sonoran Radiology, Ltd. Non-Discrimination Notice

192.    In reality, however, those groups continue to operate independently and, as described above, the doctors that work for those groups all understand they work for medical groups other than Sonoran.

**CLAIM ONE – FRAUD**
**(Against Radiology Partners and Sonoran)**

193.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

194.    The submission of a claim for reimbursement to United constitutes a certification and representation that the information shown on the claim is true, accurate, and complete, and that the submitted claim did not knowingly or recklessly disregard or misrepresent or conceal material facts.

195.    Each time Sonoran and Radiology Partners submitted a claim or caused a claim to be submitted they represented that Sonoran performed the services being billed and, thus, Sonoran was entitled to reimbursement for those services.

196.    Yet, the claims that Sonoran and Radiology Partners submitted using Sonoran's TIN were related to services performed by providers who worked for medical groups other than Sonoran, rendering these representations false.

197.    United relies on the TIN billed by providers to identify the medical group that performed the services, whether claims are payable, and what rate the underlying services would be reimbursed at.

198.    Thus, these misrepresentations were material to United's determination of whether the claims at issue billed by Sonoran were payable to

Sonoran, and to United's determination of the proper reimbursement to allow for those claims.

199.    Sonoran and Radiology Partners made these misrepresentations with the intent to wrongfully induce United to pay Sonoran for services that it did not perform, and to allow and pay higher reimbursement amounts than United should have allowed or paid pursuant to its contracts with the provider groups who performed the services.

200.    United reasonably relied on these misrepresentations by Sonoran and Radiology Partners, and paid the claims. Because United processes over one million claims per day, the vast majority are adjudicated by United's claims processing systems, trusting that the information submitted on the claims is accurate. Due to the volume of claims that United processes, United cannot investigate the accuracy of each claim before making the decision to pay it, as doing so would grind the healthcare system to a halt.

201.    Instead, United relied on Sonoran's and Radiology Partners' representations that the information on the claims was true, accurate, and complete, that Sonoran provided the services billed, and that Sonoran and Radiology Partners did not knowingly or recklessly disregard, misrepresent, or conceal material facts.

202.    Sonoran and Radiology Partners also fraudulently concealed and failed to disclose the truth about the scheme, as detailed above.

203.    Sonoran and Radiology Partners also knowingly omitted material information from United. As detailed above, Sonoran and Radiology Partners concealed that SMIL, Sun City, and other groups across Arizona had been acquired by Radiology Partners, and that Sonoran was now billing for services provided by other medical groups owned by Radiology Partners.

204.    Because of its reliance on Defendants' omissions and misrepresentations, United was damaged.

205.    Thus, United is entitled to an award of damages in an amount to be proven at trial.

## CLAIM TWO – NEGLIGENT MISREPRESENTATION AND OMISSION
### (Against Radiology Partners and Sonoran)

206.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

207.    The submission of a claim to United constitutes a certification and representation that the information shown on the claim is true, accurate and complete, and that the submitted claim did not knowingly or recklessly disregard or misrepresent or conceal material facts.

208.    Each time Sonoran and Radiology Partners submitted, or caused to be submitted a claim, they represented that the provider who performed the service was working under Sonoran, as opposed to another medical group.

209.    Likewise, each time Sonoran and Radiology Partners submitted, or caused to be submitted a claim, they represented that Sonoran performed the services being billed (as opposed to another medical group) and, thus, that Sonoran was entitled to reimbursements for those services.

210.    Yet, the services that Sonoran and Radiology Partners billed under Sonoran's TIN were performed by providers who were part of medical groups other than Sonoran. Thus, the billed services were performed by the other medical groups and not by Sonoran.

211.    These representations were material to United's determination of whether claims submitted and billed by Sonoran were payable to Sonoran.

212.    Sonoran and Radiology Partners made the aforementioned misrepresentations and omissions with the intent to wrongfully induce United and its plan sponsors to make payment on the claims to Sonoran.

213.    Sonoran and Radiology Partners also acted under a regime of concealment and misdirection to keep United from discovering the truth about the

massive pass-through billing scheme that they were implementing. As described above, they specifically concealed that groups across Arizona had been acquired by Radiology Partners and that Sonoran was now billing for medical services rendered by those other medical groups.

214.    Those representations were false, and Radiology Partners and Sonoran either knew the representations were false, made them without knowledge of their truth or falsity, or made them under circumstances in which Radiology Partners and Sonoran ought to have known of their falsity.

215.    Radiology Partners and Sonoran intended or expected that United and its plan sponsors would rely on their misrepresentation in paying claims.

216.    United justifiably relied on Radiology Partners' and Sonoran's misrepresentations and was damaged as a result by making payments on the claims that were submitted.

217.    Radiology Partners and Sonoran had superior and special knowledge of this scheme, including their relationship with each other and other Radiology Partners-controlled medical groups, and that Sonoran was submitting claims for medical services rendered by these other medical groups.

218.    Radiology Partners and Sonoran had a duty to disclose to United information material to the claims Sonoran was submitting for reimbursement.

219.    Radiology Partners and Sonoran understood that, under the circumstances, Radiology Partners and Sonoran had a special relationship of trust and confidence toward United that gave rise to a duty to speak and disclose material information regarding the claims being submitted, and United understood based on the existence of that duty that material information would be disclosed to it. Radiology Partners' and Sonoran's failure to submit accurate information thus constitutes a failure to exercise reasonable care.

220.    By virtue of the foregoing, United is entitled to an award of damages in an amount to be proven at trial.

## CLAIM THREE – CIVIL CONSPIRACY
### (Against Radiology Partners and Sonoran)

221.   United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

222.   Radiology Partners, Sonoran, the other medical groups acquired by Radiology Partners, and private-equity firms giving funding to Radiology Partners (including New Enterprise Associates, Starr Investment Holdings, and the Future Fund) conspired together to unlawfully, fraudulently, and deceitfully procure funds from United through the billing scheme described herein.

223.   Each of the co-conspirators played an integral role in carrying out this billing scheme:

    a. Private-equity firms such as New Enterprise Associates, Starr Investment Holdings, and others armed Radiology Partners with hundreds of millions in funds so that it could acquire other medical groups, achieve market dominance, and play shell games with submitting claims to maximize profits.

    b. Radiology Partners acquired medical groups across Arizona, and thereafter controlled how the claims for services performed by providers affiliated with those medical groups would be billed, including funneling all such claims through Sonoran's TIN and on an out-of-network basis.

    c. Sonoran gave Radiology Partners an out-of-network TIN, submitted the claims for reimbursement to United, and received reimbursements to which it was not entitled.

    d. The other medical groups controlled and owned by Radiology Partners in Arizona allowed services provided by their physicians to be billed under Sonoran's TIN so that the scheme could realize increased volumes.

- 49 -

224.    These conspiring entities engaged in aggravated and outrageous conduct with an intent to injure or defraud, or deliberately interfere with the rights of United and its plans' sponsors and members, consciously disregarding the unjustifiably substantial risk of harm to United and its plans' sponsors and members.

225.    The concerted action has caused United to be damaged by paying substantial reimbursements on claims that were fraudulent and the product of unlawful, unfair, and deceptive trade practices.

226.    By virtue of the foregoing, United is entitled to an award of compensatory and punitive damages together with interest costs, an injunction prohibiting the conspiring entities from continuing to engage in the tortious and unlawful conduct described above, and any other relief the Court deems just and proper.

## CLAIM FOUR – MONEY HAD AND RECEIVED
### (Against Radiology Partners and Sonoran)

227.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

228.    Radiology Partners and Sonoran are liable for money had and received.

229.    United paid claims to Sonoran, and those funds were then funneled to Radiology Partners.

230.    United would not have paid those claims to Sonoran but for the wrongful conduct of Sonoran and Radiology Partners as described herein.

231.    Sonoran and Radiology Partners entered into a conspiracy to cause United to pay Sonoran for medical services not performed by Sonoran.

232.    Without revealing the truth to United, Sonoran and Radiology Partners gouged United and its plan sponsors.

233.    The funds paid by United should be returned in good conscience.

234.    Accordingly, United seeks the return of money had and received to compensate United.

## CLAIM FIVE – UNJUST ENRICHMENT
### (Against Radiology Partners and Sonoran)

235.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

236.    Sonoran and Radiology Partners are liable under the principle of unjust enrichment.

237.    Sonoran and Radiology Partners used wrongful conduct to obtain a benefit to which they are not entitled.

238.    Sonoran and Radiology Partners submitted claims and/or caused claims to be submitted to United containing the misrepresentation that Sonoran, rather than other medical groups controlled by Radiology Partners, performed the services billed.

239.    Relying on this misrepresentation, United paid the claims to Sonoran. Those funds were then funneled to Radiology Partners. Consequently, Sonoran and Radiology Partners were enriched, while United sustained an impoverishment.

240.    United would not have paid the claims to Sonoran but for the wrongful conduct of Sonoran and Radiology Partners as described herein.

241.    As a result, Sonoran and Radiology Partners have been unjustly enriched and United, its plan sponsors, and their member employees have been injured without justification.

242.    It would be inequitable for Sonoran and Radiology Partners to retain amounts United paid as a result of Sonoran and Radiology Partners' wrongful conduct alleged herein.

243.   United lacks an adequate remedy at law for the injuries inflicted by Radiology Partners and Sonoran, and accordingly seeks the return of that money in equity to compensate United and its plan sponsors.

## CLAIM SIX – VACATION OF NSA IDR
## AWARDS UNDER 9 U.S.C. § 10
### (Against Sonoran)

244.   United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

245.   The NSA allows a district court to vacate an IDR award in the following four circumstances:

a.   where the award was procured by corruption, fraud, or undue means;

b.   where there was evident partiality or corruption in the arbitrators, or either of them;

c.   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

d.   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

42 U.S.C. § 300gg–111 (c)(5)(E)(1) (adopting standards found at 9 U.S.C. § 10(a)).

246.   "A determination of a certified IDR entity . . . shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." 42 U.S.C. § 300gg-111(E)(i)(1).

247.   Since effectuation of the scheme described herein, Sonoran has improperly initiated and received awards for thousands of NSA IDR disputes.

248.    In doing so, Sonoran falsely attested to HHS, the IDR entity, and United that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process."  Upon information and belief, HHS and the IDR arbitrators rely on this attestation to determine that a submitted dispute is subject to the NSA IDR process.

249.    These awards were each "procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1).

250.    By initiating these NSA IDR processes, Sonoran represented that the claims at issue were properly payable to Sonoran and/or were for medical services rendered by a "nonparticipating provider or a nonparticipating facility." Id. § 300gg-111(c)(1)(A).

251.    However, in reality, these claims were rendered by "participating provider[s]" because the physician that actually provided the services at issue had a "contractual relationship" with United "with respect to the furnishing of such an item or service at such facility." Id. § 300gg-111(a)(3)(E)(v)(G)(ii). Thus, these claims were never subject to NSA IDR.

252.    Sonoran also made material misrepresentations in the IDR process about having prior network agreements with United and the rates at which those alleged network agreements reimbursed.

253.    Sonoran also made material misrepresentations to United and the IDR entities that services were eligible for the IDR process even though Defendants knew or should have known that those services were ineligible for a variety of different reasons including that there was no open negotiations period, that the formal IDR process was not timely, and that the underlying services were not eligible under the NSA.

254.    Because of the covert nature of the scheme, the false attestations, and other acts and omissions taken by Defendants described above and to be borne out

through discovery, United could not have discovered the fraud prior to or during the IDR process.

255.   These awards also amount to the IDR entities "exceed[ing] their powers[.]" 9 U.S.C. § 10(a)(2).

256.   Specifically, the NSA only provides IDR jurisdiction over disputes relating to claims submitted by a "nonparticipating provider or a nonparticipating facility." But all of the claims at issue were submitted by "participating provider[s]." Thus, the IDR entities lacked statutory authority to render these awards.

257.   The IDR entities reasonably relied upon Sonoran's misrepresentations, including but not limited to the false attestation that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process." This induced the IDR entities to "exceed their powers" and render awards on claims for reimbursement not subject to the NSA in the first instance.

258.   As described herein, Sonoran and Radiology Partners have gone to extreme lengths to keep their billing scheme undetected. United only recently uncovered the scheme and, in all respects, has acted with reasonable diligence to now promptly seek vacatur of the IDR awards at issue.

259.   In sum, the NSA IDR awards procured by Sonoran's "corruption, fraud, and undue means" run contrary to the purpose of the NSA and have driven the costs of healthcare up for all, without any justification. Likewise, due to Sonoran's misrepresentations, the IDR entities rendering these awards "exceeded their powers" by issuing decisions on claims for services actually rendered by "participating provider[s]." Accordingly, the Court should vacate all NSA IDR awards fraudulently obtained by Defendants.

1
2

## CLAIM SEVEN – ARIZONA RICO, A.R.S. § 13-2314.04
## (Against Radiology Partners and Sonoran)

3      260.    United incorporates by reference as fully set forth herein the

4   allegations in the preceding and succeeding paragraphs.

5      261.    Radiology Partners, Sonoran, the other medical groups acquired by

6   Radiology Partners, and private-equity firms giving funding to Radiology

7   Partners (including New Enterprise Associates, Starr Investment Holdings, and

8   the Future Fund) designed and coordinated a multifaceted out-of-network billing

9   scheme intended to procure reimbursements under Sonoran's TIN for radiology

10  services actually performed by the in-network medical groups.

11     262.    Each of the co-conspirators played an integral role in carrying out this

12  billing scheme:

13         a. Private-equity firms such as New Enterprise Associates, Starr

14            Investment Holdings, and others armed Radiology Partners with

15            hundreds of millions in funds so that it could acquire other medical

16            groups, achieve market dominance, and play shell games with

17            submitting claims to maximize profits.

18         b. Radiology Partners acquired medical groups across Arizona, and

19            thereafter controlled how the claims for services performed by

20            providers affiliated with those medical groups would be billed,

21            including funneling all such claims under Sonoran's TIN and on an

22            out-of-network basis.

23         c. Sonoran gave Radiology Partners an out-of-network TIN, submitted

24            the claims for reimbursement to United, and received

25            reimbursements to which it was not entitled.

26         d. The other medical groups controlled and owned by Radiology

27            Partners in Arizona allowed services provided by their physicians to

28

be billed under Sonoran's TIN so that the scheme could realize increased volumes.

263.    Radiology Partners, Sonoran, the other medical groups acquired by Radiology Partners, and the private-equity firms giving funding to Radiology Partners are each a "person" within the meaning of RICO, A.R.S. § 13-2314.04(A).

264.    Radiology Partners, Sonoran, the other medical groups acquired by Radiology Partners, and the private-equity firms giving funding to Radiology Partners are part of an association-in-fact enterprise within the meaning of A.R.S. § 13-2313, as set forth above.

265.    A.R.S § 13-2301(D)(4) provides that "[r]acketeering means any act, including any preparatory or completed offense, that is chargeable or indictable under the laws of the state or country in which the act occurred and, if the act occurred in a state or country other than this state, that it would be chargeable or indictable under the laws of this state if the act had occurred in this state." Racketeering is defined to include acts involving "[a] scheme or artifice to defraud."

266.    The members of the enterprise each engaged in a pattern of racketeering activity because they committed multiple acts of fraud indictable under both Arizona and Federal law within the last five years. Each claim submitted as part of the scheme described above constitutes an intentional false pretense that Sonoran performed services actually rendered by other medical groups. Such conduct is chargeable under, among other statutes, 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1952 (use of interstate facilities to conduct unlawful activity), and A.R.S. § 13-2310 (fraudulent schemes and artifices).

267.    The acts alleged herein were necessary for the enterprise to execute the scheme to defraud United. The acts alleged were related to each other by virtue of common participants, common victims, a common method of commissions, a common purpose, and a common method of defrauding United in order to enrich

Radiology Partners, Sonoran, the other medical groups acquired by Radiology Partners, and the private-equity firms giving funding to Radiology Partners while concealing their fraudulent activities.

268.    Each member of the enterprise has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above.

269.    United reasonably relied on the misrepresentations that were part of the scheme to defraud and engage in racketeering activities.

270.    As a direct and proximate result of the overt acts and racketeering activities, United has been injured in its business and property in that United has suffered compensatory damages due to the fraudulent billing scheme and the operations of the association-in-fact enterprise.

### CLAIM EIGHT – CONSPIRACY TO VIOLATE ARIZONA RICO
### A.R.S. § 13-2314.04
### (Against Radiology Partners and Sonoran)

271.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

272.    Beginning in at least 2021 through the present, Radiology Partners, Sonoran, the other medical groups acquired by Radiology Partners, and private-equity firms giving funding to Radiology Partners (including New Enterprise Associates, Starr Investment Holdings, and the Future Fund) did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree together and with each other to engage in the aforesaid conduct in violation of A.R.S. § 13-2301, as set forth in the foregoing cause of action, which qualifies as a "preparatory offense" under the definition of racketeering activity in A.R.S. § 13-2301(D)(4).

273.    Absent the joint efforts of Radiology Partners, Sonoran, the other medical groups controlled by Radiology Partners, and the private-equity firms giving funding to Radiology Partners, the scheme set forth herein would not be

successful. Acting jointly, these entities have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

274.    The above entities have also conspired to violate A.R.S. § 13-2312. The object of these conspiracies has been and is to conduct, participate in, directly or indirectly, the conduct of the affairs of the enterprises described previously through racketeering activities.

275.    As a direct and proximate result of the racketeering activities and violations described herein, and by reason of those activities and violations, United has been injured in its business and property in that United has suffered compensatory damages.

**CLAIM NINE – AIDING AND ABETTING A TORT**
**(Against Radiology Partners and Sonoran)**

276.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

277.    Radiology Partners and Sonoran engaged in the commission of torts against United, as set forth herein.

278.    Radiology Partners and Sonoran knew that the conduct described in this pleading was occurring and was a breach of duties owed to United, including because of the duties imposed on them by their submission of claims for payment to United (e.g., the certification contained on the claims submitted to United on a Form UB-04).

279.    Radiology Partners and Sonoran each actively participated in the scheme and provided substantial assistance or encouragement to one another.

280.    When Radiology Partners and Sonoran each took the acts set forth herein, which constituted substantial assistance or encouragement to one another, they knew that the conduct was tortious.

281.    United has been damaged by the scheme in an amount to be determined.

282.    Because Radiology Partners and Sonoran each knew of the scheme and gave substantial assistance to further the scheme, each is subject to liability for the torts committed in furtherance of the scheme.

### CLAIM TEN - VIOLATION OF CIVIL RICO, 18 U.S.C. § 1962(c)
**(Against Radiology Partners and Sonoran)**

283.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

284.    Sonoran, Radiology Partners, the other medical groups acquired by Radiology Partners, and private-equity firms giving funding to Radiology Partners (including New Enterprise Associates, Starr Investment Holdings, and the Future Fund) are "persons" within the meaning of 18 U.S.C. § 1961(3) that conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

285.    Sonoran, Radiology Partners, the other medical groups acquired by Radiology Partners, and the private equity firms entered into an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4). The Enterprise was an ongoing organization that functioned as a continuing unit. The Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity, and the Enterprise had the common purpose of doing the same. Sonoran, Radiology Partners, other medical groups acquired by Radiology Partners, and the private equity firms are each "persons" distinct from the Enterprise.

286.    Radiology Partners, Sonoran, other medical groups acquired by Radiology Partners, and the private equity firms established the Enterprise in order to reap windfall profits from the United through a pattern of fraudulent pass-through billing. The Enterprise worked to deceive United into overpaying for radiology services by means of fraud perpetrated over the wires or by mail.

287.    Each participant in the Enterprise played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the Enterprise's goals. The private equity firms armed Radiology Partners with hundreds of millions of dollars and endorsed and controlled their business strategy. Radiology Partners acquired medical groups across Arizona and the country so that it had control over how the claims for services performed by providers affiliated with those medical groups could be billed. Sonoran then billed United for services performed by physicians of those medical groups and received reimbursements at rates to which they were not entitled. And the other medical groups allowed services provided by their physicians to be billed under Sonoran's TIN so that the scheme could realize increased volumes.

288.    The Enterprise could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts. The members of the Enterprise functioned as a unit in pursuit of their common purpose.

289.    The relationships between the members of the Enterprise extended beyond the unlawful predicate acts at issue in this case. For instance, Radiology Partners provided other legitimate services to Sonoran and the other medical groups as part of its relationship including clinical support, leadership education and development, IT infrastructure, data & analytics, and recruitment, credentialing and human resources support. The illegal scheme at issue in this litigation was and is distinct from any legitimate business activities undertaken by the members of the Enterprise.

290.    Each participant in the Enterprise knew their scheme violated federal and state laws and breached the Agreement and acted with the specific intent to defraud United.

291.    The Enterprise engaged in and affected interstate commerce because, among other things, it fraudulently billed United for services performed by

providers outside the state of Arizona, and because Radiology Partners is a California-based company.

292.    Radiology Partners, Sonoran, the other medical groups, and the private equity firm conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity).

293.    Predicate acts of racketeering that Radiology Partners, Sonoran, the other medical groups acquired by Radiology Partners, and the private equity firms engaged in include, but are not limited to:

a.    The use of wires and mails to submit fraudulent claims to the United; and

b.    The use of the wires and mails to obtain payments from the United, and to distribute the proceeds of the scheme amongst its members.

294.    The above-described acts reveal a sustained pattern of racketeering activity, in addition to the threat of continued racketeering activity:

a.    As discussed above, the racketeering activity commenced in 2020 and continued for years thereafter to the present. During this period, the Enterprise operated continuously, requesting that United link physicians from other medical groups to Sonoran's TIN numerous times during the course of the scheme described above.

b.    Further, the Enterprise submitted claims for services performed by physicians of other medical groups under the Sonoran TIN on nearly a daily basis since the Enterprise was formed.

c.    This pattern and policy has become the regular manner in which Radiology Partners, Sonoran, and other medical groups acquired by Radiology Partners conduct their business.

295. The purpose and effect of the Enterprise's racketeering activity was to defraud United out of substantial sums of money by deceiving them into significantly overpaying Sonoran on claims for which Sonoran was not entitled to reimbursement.

296. United suffered injuries when it overpaid on fraudulent claims, losing many millions of dollars as a result of the Enterprise's racketeering activity.

297. United's injuries were directly and proximately caused by the racketeering activities, as described above.

298. By virtue of these violations of 18 U.S.C. § 1962(c), Sonoran, Radiology Partners, the other medical groups acquired by Radiology Partners, and the private equity firm are jointly and severally liable to United for three times the damages United sustained in an amount to be determined at the final hearing, plus the cost of this suit, including reasonable attorneys' fees.

## CLAIM ELEVEN - CONSPIRACY TO VIOLATE CIVIL RICO, 18 U.S.C. § 1962(d)
### (Against Radiology Partners and Sonoran)

299. United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

300. 18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

301. Radiology Partners, Sonoran, other medical groups acquired by Radiology Partners, and the private equity firm have violated 18 U.S.C. § 1962(d) by conspiring with each other to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described herein through a pattern of racketeering activity.

302.    Radiology Partners, Sonoran, other medical groups acquired by Radiology Partners, and the private equity firm engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.

303.    The nature of the above acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also that they were aware that their ongoing acts have been and are part of an overall pattern of racketeering activity.

304.    As a direct and proximate result of Radiology Partners, Sonoran, other medical groups acquired by Radiology Partners, and the private equity firms' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), United has been injured in its business and property as set forth more fully above.

305.    The purpose and effect of the conspiracy was to defraud United out of substantial sums of money by deceiving United into significantly overpaying Sonoran on claims for which Sonoran was not entitled to reimbursement.

306.    United suffered injuries when it overpaid on fraudulent claims, losing many millions of dollars as a result of the Enterprise's racketeering activity.

307.    By virtue of these violations of 18 U.S.C. § 1962(d), Radiology Partners and Sonoran are jointly and severally liable to United for three times the damages United sustained in an amount to be determined at the final hearing, plus the cost of this suit, including reasonable attorneys' fees.

## CLAIM TWELVE – DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
### (Against Radiology Partners and Sonoran)

308.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

309.    There is an actual, substantial, and present controversy between United, on the one hand, and Radiology Partners and Sonoran, on the other hand, concerning the propriety of and amounts owed (if any) on the claims billed by Defendants using Sonoran's TIN for services rendered by non-Sonoran providers.

310.    Radiology Partners and Sonoran are continuing to submit claims using Sonoran's TIN for non-Sonoran providers. Specifically, there is a controversy as to United's obligation to pay for services billed using Sonoran's TIN that were rendered by non-Sonoran providers, both retroactively and prospectively.

311.    United, Radiology Partners, and Sonoran have adverse legal interests. Radiology Partners and Sonoran contend they are entitled to payment from United for services rendered by the non-Sonoran physicians, even when such services were or are billed to United using Sonoran's TIN.

312.    Accordingly, United seeks a judgment declaring United is not obligated to pay for services billed using Sonoran's TIN that were rendered by non-Sonoran providers, both retroactively and prospectively.

## <u>JURY DEMAND</u>

United requests a jury trial as to all issues so triable.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, United respectfully requests judgment its favor granting the following relief:

      a.      An award of compensatory damages as requested herein;

      b.      An award of punitive and exemplary damages;

      c.      Equitable and declaratory relief as requested herein;

      d.      Costs;

      e.      Reasonable attorney fees;

      f.      Prejudgment and post-judgment interest; and

g.    An award of any other relief in law or equity that the Court deems just and proper.

Dated: August 8, 2025              By: /s/ Robert G. Schaffer

**ROBERT G. SCHAFFER, PLC**

Robert G. Schaffer
rschaffer@rgslawfirm.com
(602) 448-5642
13220 North Scottsdale Road
Suite 1055
Scottsdale, AZ 85254-0113

*and*

**ROBINS KAPLAN LLP**

Jamie R. Kurtz*
JKurtz@robinskaplan.com
Paul D. Weller*
PWeller@robinskaplan.com
Munir R. Meghjee*
MMeghjee@robinskaplan.com
Marcus A. Guith*
MGuith@robinskaplan.com
Kyle D. Nelson*
KNelson@robinskaplan.com
Alexa R. Ely*
AEly@robinskaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
T: (612) 349-8500
F: (612) 339-4181

*Pro hac vice* forthcoming

*Attorneys for Plaintiffs*